1
Nicolette Glazer Esq. (CSBN 209713)
nicolette@glazerandglazer.com
LAW OFFICES OF LARRY R GLAZER
2
1875 Century Park East #700
Century City, California 90067
3
T:310-407-5353
F:310-388-3833
4
ATTORNEYS FOR PLAINTIFFS
AND THE PUTATIVE CLASS

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10   _____

11   JOHN MANOS, TARA BORRELLI,          )
     AND JESSIE MANOS                     )    Civil Action No.16 cv 1142 CJC-KES
12   individually and on behalf of all   )
     similarly situated individuals      )
13                                        )   **<u>CORRECTED</u> SECOND AMENDED**
     PLAINTIFFS                           )   **COMPLAINT FOR DAMAGES,**
14                                        )   **INJUNCTIVE, AND**
                                          )   **DECLARATORY RELIEF**
15   vs.                                  )
                                          )   **<u>CLASS ACTION</u>**
16                                        )
17   MTC FINANCIAL INC; MALCOLM           )
     CISNEROS, ALC; DITECH FINANCIAL      )   **DEMAND FOR JURY TRIAL**
18   LLC; CITIMORTGAGE INC; FEDERAL       )
     NATIONAL MORTGAGE ASSOCIATION        )
19   and DOES 1-5                         )
20                                        )
21   DEFENDANTS                           )
     _____)

22

23        This is an action for damages, declaratory relief, injunctive relief, and other

24
     equitable relief arising from Defendants' unfair and/or deceptive acts and practices in
25

violation of the Fair Debt Collection Practices Act (hereinafter 'FDCPA'), 15 U.S.C. §1692 et seq., *as amended*, the Racketeer Influenced and Corrupt Organizations Act (hereinafter 'RICO'), and other state statutes.[1]

## JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over Plaintiffs' FDCPA and RICO claims pursuant to 15 U.S.C. §§1692(a) & (k), 18 U.S.C. §§1961-1968, and 28 U.S.C. §1331.

2.      This Court has supplemental jurisdiction over the remaining claims stated in this complaint pursuant to 28 U.S.C. §1367(a) because these claims form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§1391(b) and (c) because all Defendants are either residents and/or conduct business within this district and many of the representations, acts, and omissions giving rise to Plaintiffs' claims were made within this district.

## PARTIES

4.      Plaintiff John Manos is an individual residing at 5631 Foothill Dr., Agoura Hills, California ['Foothill property']. At all relevant times to this complaint Defendants have maintained that Mr. Manos is obliged to pay a debt owed to the named Defendants. Plaintiff has been harmed by Defendants' actions and is a "consumer" as defined in 15 U.S.C. §§ 1602(i) and 1692a(3).

---

[1] In accordance with this Court's order Plaintiffs have removed the causes of actions, and certain facts pertaining to said causes of action, that were dismissed without a leave to amend. Plaintiffs have not abandoned those claims and facts and preserves all claims for appellate review.

5.     Plaintiff Tara Borrelli is an individual residing within the county of Los Angeles, California. On 2 October 2015 Tara Borrelli, for valuable consideration, became the distributee of a 50% interest in the Foothill property. Since 8 March 2016 Defendants Fannie Mae, Ditech Financial LLC., and MTC Financial Inc. have taken actions to effect dispossession of Ms. Borrelli's interest in the Foothill property and to sell the property in order to pay off a debt, or a portion of a debt, that is not owed to any of the Defendants and/or cannot lawfully be collected. Plaintiff has been harmed by Defendants' actions and is a "consumer" as defined in 15 U.S.C. §§ 1602(i) and 1692(a)(3).

6.     Plaintiff Jessie Manos is the daughter of John Manos and Tara Borrelli. On no later than 17 December 2014 Jessie Manos became the good faith purchaser for value and the successor-in-interest to John Manos's interest in the Foothill property by virtue of a duly recorded quitclaim deed taken in satisfaction of a recorded judgment for outstanding child support due. Since 8 March 2016 Defendants have maintained that Ms. Manos owes a debt to the named Defendants. Since 8 March 2016 Defendants Fannie Mae, Ditech Financial LLC., and MTC Financial Inc. have taken actions to dispossess Ms. Manos's interest in the Foothill property and to sell the property in order to pay off a debt, or a portion of a debt, that is not owed to any of the Defendants and/or cannot lawfully be collected. Plaintiff has been harmed by Defendants' actions and is a "consumer" as defined in 15 U.S.C. §§ 1602(i) and 1692(a)(3).

7.     Plaintiffs Tara Borrelli and Jessie Manos are currently the vested unrestricted title owners and joint tenants of the Foothill property.

8.     Defendant MTC Financial Inc., d/b/a Trustee Corps [hereinafter 'MTC], is a
California company with its principal place of business in Irvine, California.

9.     Defendant Malcolm Cisneros, A Law Corporation [hereinafter Malcolm Cisneros] is
a law firm with its principal place of business in Irvine, California.

10.    Defendant Ditech Financial, LLC , a successor in interest to Green Tree Servicing
LLC , [hereinafter 'Ditech'] is a default mortgage servicer and a debt collection agency
with its principal place of business in St. Paul, Minnesota. Ditech regularly conducts
business in the State of California and throughout the United States.

11.    Defendant Federal National Mortgage Association, a/k/a Fannie Mae, is a
government-sponsored enterprise chartered by Congress in 1938. Fannie Mae regularly
conducts business in the State of California and throughout the United States.

12.    Defendant CitiMortgage Inc. [hereinafter CitiMortgage] is a mortgage servicing
company with a principal place of business in O'Fallon, Missouri. CitiMortgage regularly
conducts business in the State of California and throughout the United States.

13.    At all times relevant to this complaint each Defendant, for their own individual
and/or financial advantage, was acting in concert with the other Defendants and in
furtherance of an existing scheme and conspiracy to defraud consumers.

### FACTS RELEVANT TO ALL CAUSES OF ACTION

14.    On or about 11 January 1999 John Manos purchased the Foothill property, a
residential duplex consisting of two small bungalows. Mr. Manos executed a non-recourse
promissory note for the benefit of IndyMac Mortgage Holdings LLC in the amount of
$400,000 secured by a DOT signed by Mr. Manos and a second deed of trust to the seller.

15.    From its purchase in 1999 Mr. Manos has used the Foothill property as a principal residence. One of the units has been used over the years by Mr. Manos's mother and sister, as well as other family members visiting Mr. Manos and his family. At all relevant times to this complaint the Foothill property was held and used primarily for personal, family, and household purposes.

16.    On 14 July 2003 Mr. Manos refinanced the Foothill property in order to reduce his mortgage rate and monthly payments. Mr. Manos signed an ARM promissory note for the benefit of Metrociti Mortgage LLC, d/b/a/ No Red Tape Home Loan in the amount of $388,000.00. The note provided for an initial interest rate of $4.625% for five years with a rate change every six months after 1 August 2008. (Exhibits at pp. 001-5)

17.    On 14 July 2003 Mr. Manos also signed a DOT which names Metrociti Mortgage LLC as the Lender; Fidelity National Loan Portfolio Solutions as the trustee, and MERS, Inc. as the beneficiary. (Exhibits at pp. 006-29) At the same time, the DOT states that MERS, Inc. is acting solely as a nominee for Lender and Lender's successors and assigns.

18.    The 14 July 2003 mortgage is not a 'purchase money mortgage' as defined in California Civil Code section 580b(a)(3)(a).

19.    On 14 July 2003 Metrociti Mortgage LLC was only the broker for the loan. The loan was actually funded by Bank of America on 28 July 2003 and later pooled and securitized by Lehman Brothers Holdings Inc. and/or its subsidiary Aurora Bank FSB.

20.    As part of the securitization pool the Manos promissory note was sold and validly transferred several times as follows:

(A). Plaintiffs believe and hereby allege that Aurora Bank FSB remained the owner and holder of the note, loan, and deed of trust until it ceased operations in 2012, at which time the Manos loan and debt, together with the corresponding deed of trust, were apparently purchased by Fannie Mae and placed into an MBS trust pool. Despite repeated requests Ditech has refused to identify the MBS trust that held the Manos loan.

(B). In June 2012 Fannie Mae repurchased the Manos loan from the MBS trust and removed the loan from the MERS registry in anticipation of the commencement of foreclosure proceedings. Fannie Mae has remained the owner and holder of the Manos debt and promissory note to date.

21.    The core mortgage servicing rights (MSR) over the Manos loan, which are independent from the mortgage contract, were also transferred several times as follows:

(A).    On 15 August 2003 Aurora Servicing LLC acquired the MSR over Mr. Manos's loan from the originating lender.

(B). On 1 July 2004 Aurora Servicing LLC sold and transferred the servicing rights over the Manos loan to CitiMortgage LLC.

22.    These transfers of MRS did not affect in any way the status or rights of the owner and holder of the debt and loan.

23.    On 27 December 2011 CitiMortgage declared the Manos loan in default and provided a 30-day cure notice in the amount of $6,446.01.

24.    Mr. Manos requested a loan modification and consideration for a hardship treatment program but was unable to bring his account current. Mr. Manos continued to make

payments but never cured the delinquencies on his account. He made multiple disputes and requests for corrections without success.

25.    CitiMortgage never initiated foreclosure proceedings against Mr. Manos.

26.    On or about 15 January 2014 CitiMortgage Inc. sold back to Fannie Mae the servicing rights over Mr. Manos's and some other 64,000 loans with a balance of roughly $10 billion which included the majority of the delinquent loans the company had serviced for Fannie Mae until then.

27.    At some time thereafter Fannie Mae placed the Manos debt for collection with Ditech's predecessor, Green Tree Servicing LLC, a 'high touch' default servicer and a registered collection agency. At the time Green Tree Servicing LLC acquired the Manos account, the loan was already in default and had been so since December 2011. Green Tree Servicing LLC received an assignment and transfer of the Manos account solely for the purpose of facilitating the collection of said debt for Fannie Mae and acquired no right over the Manos debt, note, or deed of trust. No transfer of the Manos note occurred when Green Tree became the default servicer.

28.    On 14 July 2015 Green Tree sent Mr. Manos a Notice of Default and Right to Cure. Mr. Manos did not cure the default, and the note was accelerated on 13 August 2015.

29.    On 16 December 2015 Mr. Manos filed a complaint with the Consumer Financial Protection Bureau (CFPB), case no. 151216-001574. In response, on 21 December 2015 Ditech placed Lender Placed Insurance (LPI) on the Foothill property and added $1,202.00 to the balance of the loan and as additional debt to Mr. Manos and Ms. Jessie Manos. Jessie

Manos became the owner of the Foothill property on 2 October 2014, before the MSR transfer to Green Tree.

30.     On or about 28 December 2015 Ditech referred the Manos account for the initiation of non-judicial foreclosure to Malcolm Cisneros and MTC Financial Inc. At the time of the referral the loan was already declared in default.

31.     MTC Financial Inc. d/b/a/ Trustee Corps, the newly appointed 'substitute trustee', recorded a notice of default and affidavit on 9 March 2016 identifying the borrowers as John Manos and Jessie Manos and the amount in default as $28,607.37.

32.     No notice of sale has been recorded.

**THE CALIFORNIA NON-JUDICIAL FORECLOSURE STATUTORY SCHEME**

33.     In California a mortgage contract is comprised of two instruments: a promissory note and a mortgage/deed of trust. The promissory note is sold and transferred without being recorded in the public record. The mortgage or deed of trust (DOT) is recorded. The DOT, however, is inseparable from the note it secures and by operation of section 2936 of the California Civil Code follows the note even without a separate assignment. No assignment of a note or a deed of trust needs to be recorded under California law.

34.     Further, in California, a mortgage or a DOT creates nothing more than a lien in support of the debt which it is given to secure. A DOT does not convey the property when executed; instead, it is a three-party transaction in which real estate is conveyed by a borrower, the 'trustor,' to a 'trustee,' who holds legal title in trust for a lender, the 'beneficiary,' as security for credit or a loan the lender has given the borrower. Neither title or possession in the property pledged as security for the debt is conveyed by these

deeds, even if "on its face the deed conveys title to the trustee, because it shows that it is given as security for an obligation, it is an equitable mortgage." *See* Grant S. Nelson & Dale A. Whitman, Real Estate Finance Law § 1.6 (4th ed. 2001)). The trustee or successor trustee under a DOT is not a true trustee with fiduciary obligations nor merely an agent for the lender and the lenders successors. Instead a trustee under a DOT must act as a common agent for both the borrower-trustor and the lender-beneficiary. In 2016 the California Supreme Court held that only the "the person or entity that currently holds the note and the beneficial interest under the deed of trust—the original beneficiary or its assignee—or that entity's agent" can initiate the foreclosure process." In so holding the *Yvanova* Court emphasized that "[i]n itself, the principle that only the entity currently entitled to enforce a debt may foreclose on the mortgage or deed of trust securing that debt is not, or at least should not be, controversial… The borrower owes money not to the world at large but to a particular person or institution, and only the person or institution entitled to payment may enforce the debt by foreclosing on the security." *See Yvanova v. New Century Mortgage Corporation*, 365 P.3d 845, 851-60 (Cal. 2016).

**ASSIGNMENT AND TRANSFER OF FANNIE MAE NOTES**

35.    In order to sale mortgages to Fannie Mae lenders must use uniform promissory notes and DOT forms created by Fannie Mae. Each such promissory note states that the lender named in the note "or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder.'" (Exhibits at p. 1)

36.    All sales of mortgages by lenders and originators to Fannie Mae during the securitization process are absolute and unconditional: each seller sells, transfers, assigns,

sets over, and conveys to Fannie Mae without recourse, free and clear of any liens, all rights, title, and interest in and to the loans, including all principal due and interest accrued on them. Each seller delivers electronically to Fannie Mae a schedule identifying all loans sold and physically delivers to a designated Fannie Mae custodian the original notes endorsed in blank. For loans registered in MERS the system reflects that Fannie Mae owns 100% interest in the loans. For loans not registered in MERS the seller executes a written assignment of mortgage from the seller (or originator) to Fannie Mae that unconditionally conveys both the loan endorsed in blank and security instrument to Fannie Mae. The original unrecorded assignments are then delivered to a designated Fannie Mae facility. The biding designations in MERS and the unrecorded assignments back to Fannie Mae transform all notes into notes payable solely to the order of Fannie Mae, not to the order of bearer. These notes thus require a negotiation **and actual delivery to the new purchaser and/or assignee** for a valid transfer of a holder status**.**

37.     Fannie Mae either holds the purchased loans in its portfolio (whole loans) or holds the loans as the trustee of a Mortgage Backed Security [hereinafter 'MBS'] trust. In a securitization transaction, the MBS trust is the owner or assignee of the mortgage loans and corresponding security instruments, while the investor is a creditor of the trust entitled to the cash flow derived from the proceeds of the mortgage loans. The securitization thus results in the economic separation of the legal title to the mortgage loan and the beneficial interest in the mortgage loan obligation.

38.     Neither the notes nor the DOTs create or deal with MSR, they arise from separate contracts between Fannie Mae and its approved servicers. The MSR does not affect or

change the fact that at all times Fannie Mae or the MBS trust remain the unconditional owner and holder of the note and deed of trust and the sole entity to whom the debt is payable.

## FIRST CAUSE OF ACTION
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§1961-1968)
### (by all Plaintiffs against all Defendants)

### Count One: 18 U.S.C. § 1962(c)

39.    Plaintiffs incorporate by reference all foregoing paragraphs.

40.    Each named defendant is a registered corporation and holds and/or is capable of holding legal or beneficial interest in property: as such each is a "person" as defined by 18 U.S.C. §1961(3).

**Enterprises**

41.    Section 1961(4) defines an enterprise for RICO purposes as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

*The MERS Enterprise*

42.    Mortgage Electronic Registration Systems, Inc., (MERS) is a Delaware corporation registered in 1993. MERS is separate and distinct entity from each of the named Defendants. MERS corporation is one of the enterprises involved in the activities challenged by this complaint.

43.    MERS Inc. is a wholly owned, bankruptcy remote subsidiary of MERSCORP Inc., which is also a Delaware corporation. To track the transfer of servicing rights and

ownership of mortgage loans Fannie Mae, national banks, and other large lenders created MERSCORP Inc. which owns and maintains an electronic mortgage registry known as MERS®.

44.   MERS Inc. has no employees, offices, assets, or a physical location. MERS Inc., however, has over 20,000 'corporate officers' a/k/a 'certifying officers' who are employees of lenders, mortgage servicers, or Fannie Mae approved law firms. The offices to which these individuals are purportedly appointed are 'vice president' and 'assistant secretary' of MERS Inc. These designations are given to provide a appearance of legitimacy to acts done by the 'certifying officers'.The authority granted to these 'certifying officers' is not associated with the management of MERS Inc. or its business operations but is limited solely to: (1) executing lien releases, (2) executing mortgage assignments, (3) initiating foreclosures, (4) executing proofs of claims and other bankruptcy related documents (e.g., motions for relief of the automatic stay), (5) executing modification and subordination agreements needed for refinancing activities, (6) endorsing over mortgage payment checks made payable to MERS (in error) by borrowers, and (7) taking such other actions and executing documents necessary to fulfill the member's servicing duties. These MERS certifying officers are the same employees whom the lenders and servicers use to carry out these functions when servicing a loan or foreclosing on non-MERS mortgages. According to congressional testimony by R.K. Arnold, president and CEO of MERSCORP, Inc., to be a MERS certifying officer, one must be a corporate officer of the respective lender/servicer/law firm, have basic

knowledge of the MERS Registry, and "pass a certifying examination administered by MERS."

*The Default Industry Association-in-fact Enterprise (AIF Enterprise)*

45.    The collaboration of Fannie Mae, Ditech, Malcom Cisneros, MTC Financial, and various other Fannie Mae approved lenders, servicers, law firms, and trustees to collect debts, unearned, inflated and/or impermissible fees and costs and to conduct unlawful foreclosures is separate "enterprise" as defined by 18 U.S.C. §1961(4).

46.    This AIF Enterprise is separate and distinct from the culpable persons (the named Defendants) that participate in, and manage the enterprise. The AIF Enterprise functions as a continuing unit through an ongoing organization with a common purpose as more fully described below.

47.    The named defendants and other Fannie Mae approved lenders/servicers/law firms/vendors entered into a joint venture to service debt in default, pursue foreclosures en masse against affected borrowers, and in the process sought to, and in fact, collected millions of dollars of unearned, inflated, or unreasonable legal fees, late charges, and 'corporate advances' by exploiting the fragmented rights secured by securitized mortgage notes and deeds of trust and by wrongfully foreclosing or attempting to foreclose without authority and without paying the proceeds to the actual debt owners.

48.    In the early and mid 2000s risky subprime loans (such as 'no-docs loans', ARMs, lower initial interest rate loans, and loans with negative amortization, etc.) enabled banks to qualify more borrowers for loans and more loans for larger amounts.

49.    Large banks and mortgage originators expected that those risky loans once foisted on MBS investors would become delinquent, and Fannie Mae and the banks structured the securitization process to benefit from the anticipated future delinquencies.

50.    As shown above Fannie Mae does not service the mortgage loans it owns or securitizes. Instead, Fannie Mae enters into servicing agreements with the lender-sellers or with unrelated third-party servicers. Only approved core and default servicers a/k/a 'high touch servicers' can service and collect on Fannie Mae loans.

51.    The right to service Fannie Mae loans can be sold by one servicer to another only upon approval by Fannie Mae.

52.    During the recent financial crisis many borrowers, including Mr. Manos, fell behind on their mortgages. To deal with the deluge of delinquencies members of the AIF Enterprise adjusted their operations and processes to expedite the foreclosure process of Fannie Mae mortgages while increasing their profits at the expense of struggling home owners.

53.    To accomplish the purpose of the AIF Enterprise defendants agreed that starting in August 2008 all Fannie Mae owned and guaranteed loans must be referred by the servicers for foreclosure only to law firms who are members of the 'Fannie Mae retained attorney network.' Only small number of firms were 'approved' and included in the network. For example, only nine law firms were supposed to handle all Fannie Mae foreclosures in the entire state of California. The larger law firms, like Malcolm Cisneros, were approved as the preferred providers in multiple jurisdictions. Malcolm Cisneros was

'approved' to handles foreclosures in Arizona and Washington, in the addition to California.

54.     The servicers were responsible for monitoring all aspects of the performance of the Fannie Mae retained attorneys to whom they had made referrals, including loss mitigation activities, cure rates, and timeline performance.

55.     Non-performing loans do not generate income for the owners of the loans: as a result, the servicer of a non-performing loan does not receive base servicing fees. Instead, the Pooling and Servicing Agreements allow the servicer of the MBS trust and its subservicers to retain all charges assessed on late payments and to recoup 'corporate advances' from the ultimate recoveries on modified loans or on liquidated properties before the sale proceeds are passed on to the owners/investors of the loan.

56.     Since default generated fees dwarf the contractual base servicing fee paid by the MBS trusts and Fannie Mae, the servicer and its 'administrative agent' have little incentive to expend more than the bare minimum of effort to cure a default.

57.     On delinquent loans the MBS servicer's profitability depends on the stream of revenue derived from default related fees, including fees for late payments, phone payments, force-placed insurance, property preservation, payoff statements, loan modifications, and foreclosure actions.

58.     MBS servicers like CitiMortgage and Ditech do not undertake these default related activities themselves. Instead, the servicers replace in-house operations with affiliated subsidiaries or vertically integrated vendors who handle the various tasks associated with the management and liquidation of defaulted loans.

59.     Law firm are guaranteed a flat fee for each foreclosure regardless of the work involved. In addition, they are compensated for costs and extraordinary legal services. The Law firm's profitability depends on the speed and number of foreclosures processed.

60.     The default subservicers and attorneys like MTC Financial Inc. and Malcolm Cisneros are incentivized to impose as many charges on borrowers as possible. Because the MBS servicer is not the ultimate payer of the fees charged by the vendors and law firms, the MBS servicer has an incentive to use higher cost vendors that offer comissions, free ancillary services, and/or other financial benefits. Further, the MBS servicer has no incentive to make sure that work billed by the vendor/law firm is necessary, actually performed, or reasonable as required by the mortgage contracts.

61.     Vendors, law firms, force-placed insurers, and other outsourcers who specialize in providing subservicing, property preservation, force-placed insurance, title service, trustee services, legal services, and recordation work add a substantial mark-up to the actual costs for their services. The outsourcers then submit to the MBS servicer invoices detailing the inflated, unreasonable, and/or unearned fees in order to create a paper trail to be used to justify the fees. The MBS servicer then adds the marked-up fees to the principal balance of the borrower's debt.

62.     The MBS servicer then presents all invoices and claims for fees, charges, and advances for approval to Fannie Mae.

63.     Fannie Mae then allows the servicer to deduct the fees from the proceeds of foreclosure sales, loan modifications and cures, or from the stream of monthly payments

made by non-defaulted borrowers, thus before the investors of the MBS trust receive their share.

64.     Debtors have no choice over the selection and use of default service providers.

65.     Debtors or investors have no way to question or challenge the claimed fees and costs of default service providers. Defendants' scheme allows outsourcers to dictate costs for foreclosure-related services with no accountability.

66.     Defendants' marked-up fees violate the mortgage contract: the fees exceed the actual cost of the services and are thus not reasonable and appropriate to protect either the note holder's interest in the property or rights under the security instrument. The marked-up fees are assessed for the sole benefit of the servicer and its default vendors.

67.     The vertically integrated vendors like MTC Financial Inc. and Malcolm Cisneros, not the servicer or the lender, are in direct contact with the borrower and perform all collection functions on delinquent loans in foreclosure. These vendors are shielded from regulatory oversight and liability by using the name of the MBS servicer and/or labeling themselves "trustee" or "servicer".

68.     Pursuant to the written agreements between Fannie Mae and its various servicers and vendors, each servicer and/or vendor undertakes to perform its obligations as an independent contractor and is neither an employee or agent of Fannie Mae. Further, Plaintiffs believe and hereby allege that each servicer and /or vendor agrees to indemnify Fannie Mae for any and all losses caused by the collection activities performed by the default service provider.

69.     The AIF Enterprise described above thus procures the involvement and participation of the servicers, law firms, trustees, and vendors. Each of the named Defendants and each of the other approved participants voluntarily joined the AIF Enterprise by submitting an application to be approved as a seller, servicer, or Fannie Mae attorney network member. Upon approval each participant signed a letter of engagement with Fannie Mae and thus agreed to, and did, participate in the conduct of the Enterprise and carried out its respective role in accordance with the specific guidelines and rules Fannie Mae implemented, including detailed rules as to how foreclosures of Fannie Mae owned mortgages in default must proceed. The guidelines and other specific mandatory rules set mandatory time periods in which specific actions must be taken, reporting obligations of each participant back to Fannie Mae, and the penalties assessed for not meeting the specified time milestones. Each named Defendant was thus integral to the scheme.

70.     Fannie Mae and the servicers defendants knowingly authorized Malcolm Cisneros, MTC, and other approved law firms/vendors to claim and collect fees that they know were unearned, unreasonable, and unnecessary. Fannie Mae and the servicers defendants knowingly authorized Malcolm Cisneros, MTC, and other approved law firms/vendors to claim and collect those fees by including them into invoices, reinstatement quotes, payoff quotes, and other documents sent to borrowers.

71.     The activities of Malcolm Cisneros and MTC Financial went far beyond the rendition of routine professional services but were so intertwined with the MERS and AIF

enterprises that they in fact operated, directed, or managed the enterprise and directed its conduct once a loan was referred to them for foreclosure.

72.     The companies and individuals that comprise the AIF Enterprise are associated for the common purpose of engaging in a unified and continuous course of conduct. The AIF Enterprise conducts aggressive debt collection, speedy and collusive foreclosures or 'loss mitigation' of defaulted Fannie Mae loans and in so doing defrauds borrowers into funneling unearned money to Defendants under the guise of inflated, unearned, impermissible and/or unconscionable fees and charges for default related services without regard to whether those services were ever performed, permitted by law or contract, or necessary.

73.     Upon information and belief, the AIF Enterprise has operated since no later than the middle of 2008 and continues to this day.

74.     Both the MERS and the association-in-fact enterprises are engaged in and affect interstate commerce as each involves transfer of large amounts of money between states, targets borrowers across many states, and frequently uses the mails, telephones, facsimile, the internet, and electronic sharing platforms like MERS®, VedroeScape, LPS Desktop, and BlackNights Desktop..

**The Fraudulent Schemes**

*1.     The MERS four-party deed of trust scheme*

75.     A 1994 study, commissioned by members of the financial industry, concluded that the mortgage industry would save $77.9 million a year in state and local filing fees

associated with the need to record assignments each time notes are sold on the secondary market.

76.    Fannie Mae, CitiMortgage, Ditech, ASIC and other members of MERSCORP Inc., devised and created a proprietary private mortgage registry -- MERS® -- which exists solely because the Defendants and other members of the financial industry aspired to circumvent what Defendants perceived to be the slow, expensive, and burdensome recording process required by state laws for the transfer and assignment of residential mortgage notes on the secondary market. MERS® is keeping track of approximately 31 million active loans.

77.    To accomplish this cost-saving purpose MERSCORP Inc. and the members of the AIF Enterprise agreed to designate MERS Inc. as a common agent for the mortgage industry, and to use the sham corporation to serves as surrogate mortgagee in the county land records solely as a nominee for the owner of the mortgage loan and the beneficial interest in the security interest.

78.    MERSCORP Inc. and his president have acknowledged that this system changed the traditional three-party deed of trust into a four-party deed of trust, wherein the traditional role of the DOT beneficiary is split between the lender, who holds the beneficial rights under the security instrument and is entitled to enforce the debt, and MERS Inc., who acts as the contractually agreed upon 'nominee' for the lender and its successors and assigns and appears in the public record. MERS Inc. never owns or holds the notes, debts, or DOTs. Further MERS Inc. does not and cannot receive a payment under the note. Instead MERS Inc is paid a flat transaction and membership fee by the 3000 entity that use its services.

79.     Accordingly, during the lifetime of the mortgage, the beneficial ownership interest or servicing rights could be transferred among MERS® members (MERS assignments), but these assignments are not publicly recorded; instead MERS® tracks transfers of servicing rights and beneficial ownership interests in mortgage loans by using a permanent 18-digit number called the Mortgage Identification Number.

80.     By using MERS Inc. Fannie Mae and its servicers circumvent recordation costs when notes and/or servicing rights are sold before and after default and effectively conceal the ownership of the debt.

81.     The MERS scheme is legally deficient. Using MERS Inc as the surrogate beneficiary purports to work by separating the promissory note from the mortgage. Under California law, however, the note and the mortgage are inseparable. As such, a transfer of a note carries the mortgage with it, but the assignment of a mortgage without the note is a nullity. The four-party MERS transaction in this case is as follows:



The Boxes in Black represent parties with recorded interests up to 2 Oct 2014, when Jessie Manos's deed was placed of record.

2.    *The Intervening Assignments Scheme*

82.    When a lender-seller retains the servicing rights, the lender-seller remains the named creditor in the public record. When the servicing rights over non-MERS loans are subsequently sold to a different servicer Fannie Mae requires the execution of two separate corporate assignments: a recorded assignment of the mortgage or deed of trust from the assignor-servicer to the new servicer and an unrecorded assignment of the same mortgage or deed of trust from the new servicer back to Fannie Mae. As a result, the public record purport to reflect a transaction in which the lender of record conveys its full interest and title in the debt, note, together with the security instrument, to the new assignee-servicer which thereby becomes the new mortgagee or beneficiary of record. The public record does not show that the two entities are merely servicers of the loan and that Fannie Mae actually owns the note, debt, and the beneficial interest in the security instrument. No change in ownership of the underlying debt, loan, or security interest is intended by these intervening assignments and,

since the assignor-servicer has nothing to convey other than its mortgage servicing rights, no change in loan and debt ownership occurs. The corresponding unrecorded (but recordable) assignment held by Fannie Mae confirms Fannie Mae's unbroken chain of title. Servicers use these recorded assignments to claim that as the lender of record or the assignee of the note and DOT they have authority to foreclose in their own name and thus keep Fannie Mae's ownership of the debt, note, and mortgage secrete and insulate the GSE from having to deal with borrowers or aggrieved parties.

83.    From its inception the mortgage industry routinely foreclosed in the name of MERS Inc. as the 'beneficiary' of record. In late 1990s MERSCORP Inc. amended the rules for the use of MERS Inc. as a surrogate beneficiary, to require that when foreclosing in the name of MERS Inc. the original note had to be produced, held by the servicer/lender managing the foreclosure, and made available for inspection to the borrower or the court. After media reports exposed the fact that servicers and law firms in Florida were relying excessively on lost note affidavits to skirt the note production requirement, MERSCORP prohibited the use of lost note affidavits in Florida and in 2006 extended the rule nationwide.

84.    To avoid these rules the AIF Enterprise agreed that servicers would deregister Fannie Mae loans from the MERS® registry prior to initiating foreclosure proceedings. To replace MERS Inc. in the public record, the servicer (or a vendor of the servicer) would execute an assignment of the deed of trust to itself. One of its employee or a third party using the name of a MERS certifying officer signed those assignments. The assignment purports to convey to the servicer *all* rights, titles, and interests under the

security instruments even though, according to the mortgage contract, MERS Inc. only holds 'legal title' as the nominee to the interest granted by the Borrower in the Security Instrument. The public record does not disclose the actual interest of either Fannie Mae or the servicer. No change in ownership of the underlying debt, loan, or security interest is intended by these bogus intervening assignments and, since MERS Inc. has no beneficial interests or any other interest in the debt to convey to the servicer, no change of ownership over the debt or note occurs. The language of the assignments state otherwise and thus contains deliberate misrepresentations and/or false statements

85.     Since California law does not require assignments to be recorded, members of the MERS and AIF Enterprises record those sham assignments solely to furthering their schemes and to deceive the borrowers and the public as to the identity of the entity that actually has the right to enforce the debt, and thus has the authority to authorize and direct the initiation of a non-judicial foreclosure.

3.     *The Holder by Fiat Scheme*

86.     All named defendants knew that each Fannie Mae owned and/or guaranteed loan is payable to a named entity – Fannie Mae—and as such was not a bearer paper. All named defendants thus knew that transfer of such notes requires negotiation **and a physical delivery to the assignee.**

87.     All named defendants also knew that a foreclosing party must possess and hold both the note and the mortgage securing the note and have the right to payment under the note in order to have authority to foreclose on the mortgage lien.

88.     In order to avoid the requirements of state law pertaining to real estate transactions, negotiable instruments, and foreclosures, defendants devised a new form of a holder status applicable only to members of the AIF Enterprise and included it in the Fannie Mae's Servicing Guide:

> Fannie Mae is at all times the owner of the mortgage note, whether the note is in our portfolio or whether we own it as trustee for an MBS trust. In addition, Fannie Mae at all times has possession of and is the holder of the mortgage note, except in the limited circumstances expressly described below.
> [...]
> In some jurisdictions, only the "holder" of the note may conduct a foreclosure. In any jurisdiction in which our servicer must be the holder of the note in order to conduct the foreclosure, **we temporarily transfer our possession of the note to our servicer, effective automatically and immediately before commencement of the foreclosure proceeding**. When we transfer our possession, our servicer becomes the holder of the note during the foreclosure proceedings. **If the borrower reinstates the loan or the servicer ceases to service the loan for Fannie Mae for any reason, then possession of the note at that time automatically reverts to Fannie Mae and the note must be returned to the document custodian**. At that time, Fannie Mae also resumes being the holder, just as it was before the foreclosure proceedings. **The transfer of our possession, and any reversion of possession to us are evidenced and memorialized by our publication of this paragraph.** This Guide provision may be relied upon by a court to establish that the servicer conducting the foreclosure proceeding has possession, and is the holder, of the note during the foreclosure proceeding unless the court is otherwise notified by Fannie Mae.

89.     The Servicing Guide thus establishes that, as the servicer or subservicer conducting the foreclosure, servicers like Ditech, CitiMortgage, Trustee Corps etc., receives 'on paper only' a temporary transfer of constructive possession of the note -- automatically and immediately before commencement of the foreclosure proceeding -- by virtue of "the publication of this paragraph." This holder-by-fiat is not recognized by the California

statutory foreclosure scheme as it does not entitle the foreclosing servicer to receive a payment *of the debt* and is a per se deceptive and misleading business and collection practice: the California Supreme Court admonished that California law allows "only the institution entitled to payment [under the note to] enforce the debt by foreclosing on the security." *See Yvanova*, 62 Cal.4th at 961.

*4.     The Unlawful Fees Scheme*

**90.**     When loans are accelerated Defendants, work together to maximize default fees revenue before, during, and after the foreclosure sale, including by unlawfully imposing collection costs as follows:

A.     Fannie Mae approved law firms and trustees assess borrowers flat legal fees for each foreclosure without regard to whether any services were performed and, in addition, would assess fees for a myriad of bogus default related services by sham affiliated companies. In 2008 the fee for California foreclosures was $650.00 per initiated foreclosure; in 2016 the amount was $1000.00 each. These amounts are in addition to 'costs'.

B.     Defendants knew that the standard Fannie Mae promissory note allows only a single late fee to be added to any individual monthly payment prior to acceleration of the debt; no late fees are authorized under the mortgage contract or California law after acceleration. Defendants also knew that the mortgage contract does not allow for the pyramiding of late fees. Yet, Defendants routinely and uniformly included such impermissible fees in monthly statements, reinstatement quotes, and payoff demands and sent them to borrowers, such as Mr. Manos and Jessie Manos via the U.S. mails and fax.

5. *The Force-Placed Insurance Scheme*

LAW OFFICES OF LARRY R. GLAZER
1875 CENTURY PARK EAST, SUITE #700
CENTURY CITY, CALIFORNIA 90067

91.    All Fannie Mae owned mortgages contain an identical force-placed insurance clause permitting the Lender to purchase such insurance to protect its interest in the collateral secured by the deed of trust when the borrower's insurance lapses.

92.    The "Lender" is named in each mortgage agreement (e.g., MetroCiti is identified as the 'Lender' in the Manos note and deed of trust.)

93.    All notes also provide that any other person who "takes the note by transfer and who is entitled to receive payments under the note" falls within the definition of 'Lender'. Either the MBS trust or Fannie Mae is thus the only 'Lender' with discretion and contractual authority to purchase and impose force-placed insurance under the mortgage contract with the borrower.

94.    Fannie Mae, as the creditor and lender, never purchases force-placed insurance under the mortgage contracts.

95.    The "Loan Servicer" is treated as a separate entity in the mortgage agreement. When Ditech acts as a servicer for Fannie Mae-owned loans, Ditech is not the 'Lender' as the term is defined in the promissory notes because it does not hold the notes and is not entitled to receive payments for itself.

96.     Despite the unambiguous language of the promissory notes, Fannie Mae, its servicers, and its specialty insurers such as ASIC, devised and have maintained a scheme since at least 2004 to create a new credit transaction to fund the purchase of high priced force-placed insurance and insurance not required by law or by the mortgage contracts in order to financially benefit default servicers.

97.     Pursuant to the scheme, the servicers enter into exclusive agreements with force-placed insurance providers such as ASIC and purchase master policies for their entire servicing portfolio.

98.     ASIC or another such insurer monitors the portfolio for lapses in borrower coverage.

99.     Once a purported lapse is identified, ASIC or an affiliate sends notices to each borrower, on letterhead from the servicer, asking for proof of insurance and stating that insurance will be "purchased" and force-placed if voluntary coverage is not confirmed. If a lapse continues or proof of insurance is not submitted, the insurance agent, again using the servicers letterhead, notifies the borrower that insurance is being force-placed at his or her expense and issues an insurance certificate pursuant to the master policy. Ditech or Citi is named as the loss payee.

100.    The notices sent to borrowers are done pursuant to an automated system used to generates notices at predetermined times. No individualized underwriting ever takes place for the force-placed coverage.

101.    ASIC automatically places insurance on the property even if the borrower disputes it, already had purchased insurance, or is not required to have the insurance foisted on him/her.

102.    Once coverage is forced on the property, the servicer pays ASIC or another LPI vendor and charges the borrower for the entire payment, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan. If a borrower does not have an escrow account, the servicer creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

103.    Ditech and Citi  do not disclose to borrowers that when they 'pays' the premiums to

ASIC or another, the insurer or one of its affiliates then remits back a set percentage of each payment to a shell company created by the servicer or its corporate parent to receive "commissions" under the scheme and to circumvent the restrictions imposed on illegal kickbacks by federal consumer protection laws. The illicit payments are ultimately funneled to the servicers.

104.   Under this highly profitable force-placed insurance scheme, Ditech and Citi have an incentive to purchase high cost force-placed insurance policies on a borrower's property because the higher the cost of the insurance policy, the higher the commission received.

105.   The amounts charged to borrowers are also inflated by the interest that accrues on the amounts charged for force-placed coverage. Once Ditech and Citi add the cost of the high-priced premium to a homeowner's mortgage balance, it increases the interest paid over the life of the loan.

106.   The premiums on such force-placed insurance policies generally cost between five and ten times more than what the borrower was originally paying or what the borrower could obtain on the open market.

107.   The force-placed insurance is added regardless of whether the consumer needs it, wants it, or disputes it.

**Pattern of racketeering activity**

108.   At all times relevant to this complaint, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the two enterprises listed above through a pattern of racketeering activity, as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described.

109.   A person commits mail fraud whenever that person, having devised any scheme to defraud, uses the mail or any private or commercial carrier while executing that scheme. (18 U.S.C. § 1341). Any mailing that is incidental to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information.

110.   A person commits wire fraud whenever that person, having devised any scheme to defraud, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing that scheme. (18 U.S.C. § 1343).

111.   Defendants each engaged in two or more acts of mail and/or wire fraud within the past ten years.

### Citi Mortgage

112.   At the time he refinanced Mr. Manos declined to establish an escrow account and elected to pay the property taxes and insurance on his own. In 2010 Mr. Manos experienced financial difficulties. He was late making some monthly mortgage payments and did not pay the property taxes due for 2010.

113.   On 14 September 2010 Citi advanced and paid $1,588.00 for lender placed insurance on the Foothill property. On 13 September 2011 Citi advanced and paid $14,821.68 for property taxes on the Foothill property. Mr. Manos and Citi agreed to spread the amount over a 12-month period with a monthly payment of $1,208.21. The shortage was later spread over 48 months starting from 1 November 2011. Citi assessed interest on the escrow advances. Mr. Manos continued to pay his insurance and taxes thereafter and Citi made no further advances for insurance or taxes.

114.   After Mr. Manos disputed some of the amounts assessed, on 1 April 2014 R Greene, an employee of Citi's Customer Service Department, mailed Mr. Manos a letter in which R Greene stated that "we have reviewed your account and determine (sic) that we analyzed your escrow account on 09/12/11 and a shortage of $17,070.07 was created due to taxes and insurance being paid from your account on your behalf."  At the time R Greene made these representations she knew or should have known that the amount advanced in 2010 and 2011 was $16,409.68, not $17,070.07. She also knew that the amount paid for insurance was grossly inflated and resulted in the receipt of a commission by Citi. She further advised Mr. Manos in the letter that "RESPA guidelines allow CitiMortgage to charge interest for advancing these funds on your behalf. Interest will be charged on the outstanding advance amount. The interest on the advance will be the Note rate applicable to your mortgage loan." R Greene knew or should have known that the inflated amount of the escrow advance had caused inflated interest to have been calculated and had caused overpayment by Mr. Manos. Yet, R Greene and Citi refused to credit the overpaid amount and continued to add such inflated and unnecessary amount to the loan as devised by the AIF Enterprise.

115.   The statements in the 1 April 2014 letter were false, misleading, and/or contained material omissions and were made to induce Mr. Manos to rely on them to his detriment. Mr. Manos relied on those statement and paid the assessed fees and the grossly inflated LPI insurance.

116.   As compensation for its debt collection activities on delinquent loans owned by Fannie Mae, Citi retained all late payment charges and all 'corporate advances' and

other similar charges that are ultimately collected from borrowers regardless of their purpose, scope, or reasonableness.

117.    According to the breach letter sent by Citi to Mr. Manos on 4 June 2012, the cure amount of $8,170.56 included $1,062.50 in late charges, $121.50 in delinquency fees, and $1,254.70 in "other fees" (Exhibits P.00032) The letter directed Mr. Manos to send the "past due amount" and gave Citi's address in Des Moines. The Letter was sent by Lobryant Torrence on behalf of Citi. A partial accounting sent to Mr. Manos by Citi at a later date that included charges up to December 2013, shows that Citi had assessed $122.23 in escrow advances and servicing charges and $175.50 in delinquency fees for property inspections. No other fees appear on the account statement. The 4 June 2012 letter, thus, misrepresented the amount of the debt owed by $886.27 and deliberately omitted an explanation for the nature of the 'other fees' added to Mr. Manos's loan.

118.   The statements in the 4 June 2012 letter were false, misleading, and/or contained material omissions and were made to induce Mr. Manos to rely on them to his detriment. Mr. Manos relied on those statement and paid the assessed fees.

119.   According to the periodic statement sent by Citi to Mr. Manos via USPS in August 2013 Citi had assessed and requested payment of the following additional charges: $1,339.70 in servicing fees and $1,422.31 in late charges. From January 2014 until July 2014 Citi assessed $537.42 in additional post-acceleration late fees. Mr. Manos paid some of the assessed charges; all unpaid fees and advances were added to the balance of Mr. Manos's loan. In its last periodic statement mailed to Mr. Manos, and dated 16 January

2015 Citi, represented to Mr. Manos that he had a positive escrow balance of $303.41, an unapplied balance of $54.15, and principal balance of $287,482.20. (Exhibits at p. 0034)

120.   Yet, the ARM interest reset notice sent by Ditech to Mr. Manos on 6 July 2015 reported the unpaid balance of the loan as $280,425.01. The 16 January 2015 periodic statement thus deliberately misrepresented the true balance of Mr. Manos's loan and increased the loan principal by $7,057.19 before transferring the MSR to Ditech.

121.   On or about 10 September 2012 as required by Fannie Mae and MERS rules CitiMortgage prepared and recorded an assignment from MERS, as nominee for MetroCiti Mortgage LLC, to itself purporting to assign the Manos deed of trust including "any rights due or to become due thereon" to CitiMortgage, Inc. (Exhibits at p. 0064) The assignment is signed by Kimberly Goeltz as a 'certifying officer' for MERS Inc. when in fact she was an employee of Citi or one if its vendors. At the time of executing and recording the intervening assignment both Kimberly Goeltz and CitiMortgage knew that Fannie Mae neither intended to nor did it ever sell, assign, or negotiate the Manos note or deed of trust to CitiMortgage. The intervening assignment was intended solely to make CitiMortgage the trust beneficiary in the public record in anticipation of foreclosure. However, since no refer to foreclosure was ever made, the holder by fiat transfer of constructive possession had never been made to Citi. As between Citi and Fannie Mae at the time of the assignment Citi only held and owned the MSR over the Manos loan.

122.   Both Kimberly Goeltz and CitiMortgage knew that MERS Inc. never held the Manos loan and only had a legal title to the security instrument. MERS Inc. could assign to Citi only such legal title and nothing more. The statement that MERS assigned to Citi "any rights due

or to become due thereon" on the note and DOT was false, as MERS Inc. never had any rights: all rights under the DOT flow to the lender-beneficiary.

***Ditech***

123.   In February 2015 Ditech caused to be prepared and sent to Mr. Manos a monthly mortgage statement alleging that Mr. Manos owes a past due amount of $2,913.13. The statement was false: Ditech knew or should have known that this amount was not owed, but had been already paid as shown by the last statement sent to Mr. Manos by Citi as explained above; Ditech had not right to request that Mr. Manos pay the amount.

124.   On 1 August 2015 Ditech sent to Mr. Manos a monthly statement representing that the amount due on 1 August 2015 was $8,339.53 and requested a payment of the amount. The notice directed Mr. Manos to detach the payment slip located at the bottom of the notice and return it with his payment. On or about 13 August 2015 Defendant Ditech accelerated the Manos loan. In response to a dispute initiated by Mr. Manos on 19 August 2015 "Customer Service Green Tree /lfs/49/", on behalf of Ditech, represented that the amount due was $8,502.57. Ditech and its employee "Customer Service Green Tree /lfs/49/" knew that the correct amount would have been $8,421.05 not $8,502.57, yet provided no explanation for the discrepancy and the additional charge added to Mr. Manos's account.

125.   Defendant Ditech knew that the promissory note allows only a single late fee to be added to any individual monthly payment prior to acceleration of the debt; no late fees are authorized under the mortgage contract or California law after acceleration. Defendant Ditech also knew that the mortgage contract does not allow for the pyramiding of late fees.

Law Offices of Larry R. Glazer
1875 Century Park East, Suite #700
Century City, California 90067

Second Amended Complaint – 34

Yet, in monthly statements sent to Mr. Manos after 2 September 2015 Defendant deliberately inflated the monthly payments due as follows:

a. After 2 September 2015 Defendant requested that Mr. Manos make a payment to Green Tree for the monthly payment due for November 2015 in the amount of $2,770.64 and then in 3,097.57. The correct amount prior to acceleration should have been $2,769.67 for the month in which the payment was due and $2,851.19 with the late fee thereafter.

b. After 2 September 2015 Defendant requested that Mr. Manos make a payment to Green Tree for the monthly payment due for December 2015 in the amount of $2,770.64, then for $2,853.01 and $3,179.94. The correct amount prior to acceleration should have been $2,769.67 for the month in which the payment was due and $2,851.19 with the late fee thereafter.

c. After 2 September 2015 Defendant requested that Mr. Manos make a payment to Green Tree for the monthly payment due for January 2016 for $2,853.01 and then for $3,262.31. The correct amount prior to acceleration should have been $2,769.67 for the month in which the payment was due and $2,851.19 with the late fee thereafter.

126.   From March 2015 to June 2016 Ditech represented in each monthly mortgage statement that the principal amount of Mr. Manos's loan was $283,462.75. The statement was false: Ditech knew that the true and correct amount of the principal balance was $280,425.01, but deliberately inflated the debt by 3,037.74 for its own financial benefit.

127.   On 19 June 2015 Ditech responded to Mr. Manos's FDCPA dispute and identified Fannie Mae as the owner of "the account and the Note".  On 29 June 2015 Ditech corrected the information provided on 19 June 2015 by identifying the owner of the mortgage loan as

Fannie Mae in its capacity as "Trustee" for a "Trust Identifier: 748643." On 4 November 2015, however, Ditech falsely represented to Mr. Manos that "the Deed of Trust and Note were conveyed to Ditech from CitiMortgage at acquisition." In fact, Ditech never received any ownership or holder status over the note from CitiMortgage because CitiMortgage had nothing to convey to Ditech, having already divested itself of all interests in the Manos debt, loan, and mortgage during the MSR sale to Fannie Mae. Ditech also asserted that it "holds the note and will not issue any lien release until the debt is satisfied." At the time Ditech made these false and/or misleading statements Ditech knew or should have known that either the MBS trust or Fannie Mae owned and held the Manos note and deed of trust after the repurchase. No foreclosure had been initiated against the Foothill property at the time Ditech made these representations and no "holder-by-fiat" transfer had yet occurred.

128.   Ditech knew that John Manos had elected to pay, and did pay, for insurance on the Foothill property.

129.   After John Manos quit-claimed his interest in the Foothill property to his daughter Jessie Manos, Tara Borrelli obtained property insurance for the Foothill property. A policy with Farmers Insurance effective 20 November 2015 provided coverage for over $400,000 on the Foothill property. The charge for the policy was $782.45 for the premium and $12.00 for fees. (Exhibits at p. 42)

130.   On 19 December 2015 Ditech and ASIC force-placed a lender policy on the Foothill property that provided coverage for $206,000. The Defendants assessed $1,202.00 for the force-placed insurance and added this new credit transaction to the Manos loan.

Law Offices of Larry R. Glazer
1875 Century Park East, Suite #700
Century City, California 90067

131.   This Court found that the ASIC police was for an earthquake insurance. However, no such insurance is required under the mortgage contract, California law, or published Fannie Mae Guidelines. (Exhibits at pp. 0098)

132.   Ditech made the false statements described above and used the US mail to deliver them to Mr. Manos to obtain from him money in furtherance of the AIF Enterprise and pursuant to the scheme described in this complaint.

133.   The acts described in paragraphs 123-30 constitute false, misleading, and/or deceptive representations. Defendant Ditech made these representations with knowledge of their falsity or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred.

134.   Plaintiffs believe and hereby allege that, as required by the Fannie Mae servicing guide, when Green Tree obtained the default servicing rights over the Manos loan Green Tree executed a corresponding assignment of the deed of trust back to Fannie Mae. This assignment from Green Tree to Fannie Mae was never recorded, but divested Green Tree of any legal or equitable rights over the note and deed of trust [hereinafter 'Ditech unrecorded assignment'].

135.   To memorialize the intervening transfer of default servicing and collection rights, on or about 27 February 2015 an outsourcing entity acting on behalf of Green Tree prepared and recorded a corporate assignment of deed of trust purporting to "convey, grant, assign, transfer, and set over" the Manos deed of trust together "with all rights, title and interest secured thereby, all liens, and any rights due or to become due thereon" from CitiMortgage to Green Tree. (Exhibits at p. 0067) At the time the corporate assignment of deed of trust was

executed and recorded CitiMortgage was neither the owner nor the holder of the Manos note and deed of trust, and therefore had nothing to convey, assign, or transfer to Green Tree. Further at the time the corporate assignment of deed of trust was executed and recorded CitiMortgage had not servicing rights to sell, assign, or transfer to Green Tree, the servicing rights having been re-sold to Fannie Mae in 2014. At the time the bogus assignment of deed of trust was executed and recorded both CitiMortgage and Green Tree knew that no ownership over the deed of trust was transferred and none occurred. At the time the bogus assignment was executed, and recorded CitiMortgage and Green Tree knew that the loan, note, and deed of trust were owned and held by Fannie Mae. Yet, it sent the assignment containing false statements and material omissions to the Los Angeles recorder's office via the US mail or electronically in furtherance of the schemes described above.

***Malcolm Cisneros and MTC Financial***

**136.**   In June 2016 Mr. Manos requested information and a payoff amount from MTC Financial Inc. d/b/a Trustee Corps. At the time Mr. Manos made the request, he did not know that 2016 Malcolm Cisneros and MTC Financial Inc. are related entities that collect debt and foreclose on security interests using the d/b/a 'Trustee Corps'.

137.   He also did know that from January 2016 to the present Trustee Corps has acted as the purported substitute trustee for the Manos deed of trust while at the same time representing Fannie Mae as foreclosure counsel. In such capacity and pursuant to its contractual obligation with Ditech, Malcolm Cisneros/Trustee Corps also acts as a default servicer and is responsible for and actually performs all servicing functions for the loan from the date of foreclosure referral until the final resolution of the delinquency, including but not limited to

collecting payments from borrowers to reinstate, modify, or cure defaults; accepting, rejecting, and posting payments; imposing restrictions and limits on how, when, and in what form payments were to be made; accepting loan modifications; and preparing and issuing reinstatement quotes and beneficiary statements, and communicating directly with the debtors or purported debtors. These activities are incompatible with the limited and well-defined duties of a trustee under a deed of trust under California law: section 2924 of the California Civil Code does not provide a trustee with collection or mortgage servicing authorities. A true trustee has solely the power and the corresponding duty to initiate and conduct foreclosure proceedings on the property upon the trustor's default by recording mandatory notices, resulting in a sale of the property as provided by the California Civil Code. Any other activities taken to collect Fannie Mae's debts constitute general debt collection rather than enforcement of security interests through non-judicial foreclosure.

138.   On 7 June 2016 Marisol Nagata Esq., the General Counsel of Trustee Corps sent Mr. Manos a letter via the mail and represented to him that Trustee Corps is "unable to provide loan information [Mr. Manos had] requested as Trustee Corps serves a nominal capacity as foreclosure trustee." The statement was false. Pursuant to its contract with Fannie Mae and Ditech, Malcolm Cisneros/Trustee Corps was solely responsible to manage the Manos loan from the 28 December 2015 referral until the completion of foreclosure or cure of the default. In fact, the next day Malcolm Cisneros prepared and mailed to Mr. Manos the precise payoff statement containing the information Mr. Manos had requested. Plaintiff believes and hereby alleges that Ms. Nagata made the representations in the 7 June 2016 letter because she knew that while acting as trustee under the DOT Trustee Corps's general

debt collection activities are not authorized by California law.

139.   On 9 June 2016 Trustee Corps sent to non-debtor, Ms. Jessie Manos, an unsolicited reinstatement demand for $40,299.54, which included debt allegedly owed in the amount of $38,976.08; $743.82 in late charges; $84.89 in pending late charges; and corporate advances in the amount of $494.75. Defendants knew that Ms. Jessie Manos is not a signatory to either the note or deed of trust, does not owe any debt to either Fannie Mae or the MBS Trust, and did not request a reinstatement or payoff quote from any of the named Defendant.

140.   On 27 July 2016 Trustee Corps sent to non-debtor, Ms. Jessie Manos, a second unsolicited reinstatement demand for $44,318.98, which included debt allegedly owed in the amount of $41,573.34; $828.71 in late charges; $84.89 in pending late charges; corporate advances in the amount of $494.75; mailing and recordation for $157.54; and title services for $225.00.

141.   Defendants knew that Ms. Jessie Manos is not a signatory to either the note or deed of trust, does not owe any debt to either Fannie Mae or the MBS Trust, and did not request a reinstatement or payoff quote from any of the named Defendant.

142.   At the time Trustee Corps requested the payment of $40,299.54 and $44,318.98 Defendant Trustee Corps represented to Ms. Jessie Manos that "[y]ou must pay the total amount due stated in the Demand (in cash or cashier check only) on or before the expiration date to REINSTATE and/or PAY OFF this loan. Please review the attached documents for specific payment instructions".

143.   The representations described in paragraphs 136-40 were false, misleading, and/or deceptive and contained material omissions. The debt stated in each letter was deliberately

inflated by misrepresenting the amount of the principal due and seeking post-acceleration late fees. Further, the letter falsely stated that Ms. Manos, who is not the debtor, could reinstate and assume her father's loan by paying the amount. Defendants made these representations with knowledge of their falsity or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred.

144.   The representations described in paragraph above were made to deceive Plaintiffs Jessie Manos and John Manos; to conceal Trustee Corps's status as a debt collector; to receive payment of money, and to limit the application of the FDCPA to these Defendants. The predicate acts were done in furtherance of the AIF Enterprise and in accordance with the five schemes to defraud devised by Defendants and described above.

145.   In carrying out these schemes and artifices Defendants used and continue to use the mails to deliver assignments of deeds of trusts containing material misrepresentations of fact to county recorders and to the borrowers and to deliver to borrowers monthly statements, reinstatement quotes, and payoff demands. A portion of the money Defendants attempted to collect through these payment demands was not due; a portion constituted fees not permitted by law and/or applicable contractual agreements; and a portion constituted expenses not actually incurred by Defendants. Defendants also used electronic communications such as email, fax, and electronic software platforms like CoreLogic, First American Mortgage Solutions, Vendorscape, and LPS Desktop to deliver bogus assignments of deeds of trust signed by robo-signers and reinstatement quotes and payoff demands containing unearned, prohibited, or inflated fees and costs.

146.   At all times relevant to this complaint it was reasonably foreseeable to Defendants that

the mails and/or wires would be used in furtherance of the five fraudulent schemes, and as alleged above.

147.   The nature and pervasiveness of the MERS and AIF Enterprises necessarily involved frequent and repeated mail and/or wire transmissions during the period from mid-2008 to the present. The precise dates of every transmission cannot be alleged without access to the books and records of Defendants and their agents. Plaintiffs believe and hereby allege that for each Fannie Mae owned loan referred for foreclosure to Trustee Corps, Malcolm Cisneros, or other law firms/trustees for which Ditech or CitiMortgage was not the original lender Defendants performed the following acts: (1) Defendants recorded at least one bogus assignment of deed of trust to create the paper trail to allow foreclosure in the name of the default servicer; (2) every month from default to resolution Defendants Ditech and CitiMortgage sent to each borrower a monthly statement containing post acceleration late fees, unearned "corporate advances," and unlawful kickbacks disguised as "other fees"; (3) Defendants charged each borrower the same fixed legal fees, adjusted upward annually, as set by Fannie Mae; and (4) Defendants sent correspondence in the form of reinstatement quotes, payoff demands, loan modification agreements, or post foreclosure accounting statements in which the cumulative amount of the kickbacks and unearned fees were added to the original debt and charged as due to the Lender, i.e. Fannie Mae. Since Fannie Mae owns and holds over 28% of all U.S. mortgages there were likely over 50,000 such transmissions during the relevant time period.

148.   Each mailing, fax, and electronic transmission was an essential part of the scheme to funnel money to Defendants and to create the appearance of legitimacy through false and

LAW OFFICES OF LARRY R. GLAZER
1875 CENTURY PARK EAST, SUITE #700
CENTURY CITY, CALIFORNIA 90067

misleading statements. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

149.   Each named Defendant participated in the schemes to defraud knowingly, willfully, and with a specific intent to accomplish the purpose of each scheme, namely to defraud borrowers into funding kickbacks and to subsidize Defendants' business model.

150.   Each named Defendant was a common participant in the predicate acts. Their activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive borrowers such as the named Plaintiffs and the putative class.

<u>Injury to Plaintiffs and the putative class</u>

151.   As a direct and proximate result of the violations of 18 U.S.C. §1962(c) by Defendants, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. §1964(c).

152.   The inflated and/or unearned default related fees were added to borrowers' debts and accrued interest at the rates specified in the mortgage notes until paid in full. Defendants' conduct had the direct result of depleting escrow accounts, causing borrowers to pay money they did not owe, creating additional debt.

153.   By concealing Fannie Mae's ownership of the debts, loans, and mortgages Defendants denied borrowers the ability to deal with the holder of the note to resolve disputes that the servicers refused to acknowledge or correct or to take advantage of legal protections afforded to them against creditors but not against agents and servicers. Where the homeowner does need to know more about the loan to protect its interest, ignorance injures the borrower. Further, when misrepresentations, fraud, or irregularities had occurred, as shown by this

case, the borrower cannot locate the party accountable and/or with authority to correct the irregularity. The borrowers lose their statutory rights as a direct result of defendants' schemes and activities and the ability to obtain refund of money unlawfully paid.

154.   When Defendants and other members of the MERS and AIF Enterprises use the bogus intervening assignment to foreclose or attempt to foreclose, they could not accomplish the desired result absent the void assignments. Thus as the Yvanova Court explained, "[t]he identified harm—the foreclosure and the loss of their home—can be traced directly to [the foreclosing entity's] exercise of the authority purportedly delegated by the assignment," an authority they otherwise do not have. Further, the assignments recorded in furtherance of the schemes described above render title to property unmarketable. As a result, some borrowers lost their homes because Defendants deliberately failed to follow and/or manipulated the mandatory rules contained within the California foreclosure statutory scheme

155.   The amount of the unlawful debts Plaintiffs and the putative Class were compelled to fund and pay is quantifiable and includes post-acceleration fees, inflated and unearned force-placed insurance premiums retained by the servicers, excessive and unearned foreclosure legal fees of $725 or more, unearned fees for default related services that were not performed, not necessary, and/or not within the scope of the agreements between the parties to the mortgage contracts.

156.   Congress has already determined that the aggregate effect of an unlawful kickback/referral arrangement, such as sham captive mortgage reinsurance arrangements and price fixing agreements, is to unnecessarily inflate and artificially maintain the costs consumers pay for real estate settlement services. See 12 U.S.C. § 2601(b) ("It is the purpose

of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."). Further, Congress has determined that debtors must remain free from predatory collection practices. *See* 15 U.S.C § 1692 ("There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy") Defendants' schemes were implemented to avoid statutory safeguards meant to prevent the precise evils unleashed by Defendants on American home owners.

157.   The specific injuries identified above have been recognized as widespread in the mortgage lending marketplace. *See generally* OCC Settlement agreements.

158.   The injuries alleged herein were caused directly by Defendants' commission of one or more of the predicate acts identified above.

159.   Plaintiffs and the members of the putative class were the intended targets of Defendants' conduct and suffered injuries in fact.

160.   The injuries alleged herein were the preconceived purpose or specifically intended consequence of Defendants' racketeering activities. The complex schemes were set in motion to obtain the precise injuries suffered by Plaintiffs and the putative class: speedy foreclosures that created illicit profits for the cottage industry involving default servicers, foreclosure mills, default platform providers, and default servicers.

161.   Under the provisions of 18 U.S.C. §1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus costs of bringing this suit, including reasonable attorney fees.

**Count Two**: **18 U.S.C. § 1962(d)**

162.   Plaintiffs incorporate by reference all foregoing paragraphs.

163.   18 U.S.C. §1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

164.   Defendants have violated 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c).

165.   Defendants formed the previously identified enterprises, within the meaning of 18 U.S.C. §1961, for the common purpose of defrauding borrowers into paying money they did not owe under the mortgage contracts and foreclosing on their home without authority.

166.   The two enterprises identified in Count One were engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. §1962(c).

167.   As set forth above, each Defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. §1962(c).

168.   As set forth above, each Defendant was associated with the two enterprises and agreed and conspired to violate 18 U.S.C. §1962(c) by participating, directly or indirectly, in the conduct of the affairs of the two enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d). Defendants committed, and caused to be committed, a

series of overt acts in furtherance of the conspiracy and to accomplish its objectives, including but not limited to the acts set forth herein in paragraphs 112 to 150 above.

169.   As a direct and proximate result of these overt predicate acts, Plaintiffs and the putative Class have been injured in their business and property. Defendants injured Plaintiffs and the Class by charging unlawful fees, collecting non-existent or inflated debts, and foreclosing properties without authority.

170.   Under the provisions of 18 U.S.C. §1964(c) Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorney fees.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

### Count I: by John and Jessie Manos against
### Defendant Malcolm Cisneros

171.   Defendant Malcolm Cisneros is a law firm debt collector with a registered address at 2112 Business Center Drive, 2nd Floor, Irvine, CA 92612.

172.   California Rules of Professional Conduct, Rule 1-100(1) define the term "law firm" as "a law corporation which employs more than one lawyer." Malcolm Cisneros was registered as a law corporation with the California Secretary of State on 31 October 2001 with registration number C2400979. Its articles of incorporation state that the purpose of the law corporation is "to engage in the profession of law and any other lawful activities (other than the banking or trust company business) not prohibited to a corporation engaging in such profession by applicable laws and regulations."

173.   Malcolm Cisneros' shareholders, Mr. William Malcolm and Mr. Arturo Cisneros, are both attorneys registered and authorized to practice law by the California State Bar. In its official Linkedin profile Defendant Malcolm Cisneros represents that it employs between 51 to 200 employees. Based on public records, at least 11 of those employees are attorneys.

174.   The principal purpose of the firm's legal practice and ancillary business is the collection of debts owed or alleged to be owed others and the enforcement of security interests through judicial and non-judicial foreclosure. The firm describes itself to the public at large as representing "financial institutions in connection with their defaulted consumer and commercial loans." Defendant Malcolm Cisneros collects debts owed or alleged to be others and conducts judicial and non-judicial foreclosures, including collection of deficiency judgments against consumers, out of its offices in California, Arizona, Nevada, Oregon, Colorado, Texas, and Washington.

175.   In the process of collecting debts owed another and during judicial and non-judicial foreclosure proceedings Defendant Malcolm Cisneros also regularly uses the United States mails, telephone, facsimile, and other instrumentalities of interstate commerce in its business as described above.

176.   Since January 2012 and to the present Malcolm Cisneros has been one of only nine law firms in the State of California approved by Fannie Mae, Freddie Mac, and numerous mortgage servicers and lenders to perform default related services for delinquent mortgage loans and to conduct foreclosures, bankruptcy proceedings, loss mitigation, evictions, and REO closings on behalf of its servicer clients. To be eligible for such a GSE approval the firm must establish that it has the capabilities and resources to handle a large volume of cases

involving end to end loan servicing and default legal services for Fannie Mae and Freddie Mac owned loans.

177.   In each of the four years immediately preceding the initial filing of this Complaint Malcolm Cisneros initiated at least 175 foreclosures in the state of California and received at least 500 referrals of accounts in default for collection. Based on public records, in the four years immediately preceding the initial filing of this Complaint Malcolm Cisneros has collected or attempted to collect on at least 5,478 consumers whose debts had been declared in default in the following jurisdictions: California, Nevada, Arizona, Oregon, Washington, Hawaii, Colorado, and Texas. Malcolm Cisneros did not own any of the debt on which it attempted to collect but was acting as a law firm debt collector on behalf of the creditor.

178.   Fannie Mae and Freddie Mac require that foreclosures on their loans be performed solely by designated counsel within their respective retained attorney networks.

179.   Since 2008 Fannie Mae has maintained special foreclosure procedures for Arizona, California, and Washington as follows: (Exhibits pp. 83, 85-86)

> For nonjudicial foreclosures in Arizona, California, and Washington, servicers may continue to employ trustees of their choice. The Retained Attorney List will not include corporations that are authorized to conduct foreclosures as trustees in these states. To facilitate continuity in the transition of files from foreclosure through REO closing, when a referral is made to a trustee in one of these three states, the servicer must require that the trustee obtain evidence of title for the foreclosure from a Fannie Mae-approved title company, which will subsequently represent Fannie Mae's interests as seller in connection with the REO closing. The list of Fannie Mae-approved title companies is posted on eFannieMae.com. **All legal matters in Arizona, California, and Washington, including *judicial* foreclosure proceedings, bankruptcy cases, and litigation, must be referred to attorneys on the Retained Attorney List.**

180.   Defendant Malcolm Cisneros, thus, engages in debt collection as described within this complaint while also using MTC Financial Inc., a related entity.

181.   MTC Financial Inc. is not a law firm and is not and cannot be designated as "counsel" for any party. MTC Financial Inc. is, instead, an approved vendor for Fannie Mae as a foreclosure trustee. While collecting on Fannie Mae debts and conducting non-judicial foreclosure proceedings Malcolm Cisneros and MTC Financial Inc. use the d/b/a/ 'Trustee Corps' with an address at 17100 Gillette Ave, Irvine CA 92614.

182.   To the extent that Malcolm Cisneros has delegated some of its function to MTC, this arrangement creates an agency relationship, with Malcolm Cisneros as the principal.

183.   In communications with Fannie Mae, Freddie Mac, servicers, and default servicers Malcolm Cisneros and MTC Financial Inc. identify themselves as either

> Trustee Corps/Malcolm Cisneros
> 17100 Gillette Avenue
> Irvine, CA 92614
>
> Or
>
> Trustee Corps (Freddie Mac and Fannie Mae Processing Office)
> 2112 Business Center Drive
> 2nd Floor - Suite 201
> Irvine, CA 92612
> **Fannie Mae Retained Counsel in CA & AZ Freddie Mac Designated Counsel in AZ, CA & NV**
> **Default services in CA, NV, AK, AZ, CA, ID, MT, NV, OR, HI, TX & WA**

184.   From 28 December 2015 to the present Defendant Malcolm Cisneros, as the mandatory 'Fannie Mae retained attorney' has acted as an independent contractor debt-

collector attorney for Ditech, the purported servicer of the Manos loan, and for the debt
owner, Fannie Mae.

185.   When a Fannie Mae loan is referred to Malcom Cisneros an employee of Defendant
sends to the debtor a Foreclosure Prevention Alternatives letter on Trustee Corps letterhead
informing the debtor that his/hers "loan has been referred for foreclosure" and directing the
borrower to contact the servicer. (Exhibits at pp.96) The first page of this initial letter states
that the letter "is being sent to you by MTC Financial Inc. d/b/a/ Trustee Corps on behalf of
the Servicer of your loan." (Exhibits at pp.95)   Defendant sent such an introductory letter to
Mr. Manos on 28 December 2015. On 28 December 2015 the trustee under the Manos DOT
was still Fidelity National Loan Portfolio Solutions.

186.   When a debtor like Mr. Manos attempts to contact the 'servicer' post foreclosure
referral, Ditech directs the debtor to contact Malcolm Cisneros. For other servicers,
Defendant Malcolm Cisneros directs an employee to send a letter to the debtor using a
letterhead displaying the logo of Trustee Corps and the 17100 Gillette Avenue address in
which it states that "you are being provided this notice because of a search of the public
records or from information provided by the Servicer of your loan. To obtain a payoff or
reinstatement to cure the default, you will need to contact our office." (Exhibits at pp.97)
The address for written correspondence is designated as

> Trustee Corps
> Foreclosure Department
> 17100 Gillette Avenue
> Irvine, CA 92614.

187.   Specifically, as the it pertains to Mr. Manos, in May and early June 2016 he repeatedly called Ditech to ask for the amount due to cure and/or reinstate the loan. Ditech first informed Mr. Manos that it could not provide an estimate as to when such a quote could be sent to Mr. Manos and later stated that Ditech could not provide the amounts at all. Ditech directed Mr. Manos to request the amounts to cure, payoff, and/or reinstate from Malcolm Cisneros by fax. Mr. Manos faxed the request to Malcolm Cisneros on 8 June 2016 as directed.

188.   On 8 June 2016 a payoff statement was generated and mailed to Mr. Manos in the amount of $300,788.40, which included a principal balance of $283,462.75; $9,123.10 in interest through 6/18/2016 at 3.12500%; escrow in the amount of $5,644.69; attorney fees in the amount of $1,319.29; corporate advances in the amount of $494.75; and late fees in the amount of $743.82. Mr. Manos believes and hereby alleges that Malcolm Cisneros prepared the payoff statement and printed it or cause it to be printed on Ditech letterhead. The sole purpose of the payoff statement and Malcolm Cisneros involvement was to obtain a payment of money from John Manos for the benefit of Fannie Mae rather than enforce the purported security interest.

189.   Through the payoff statement Malcolm Cisneros requested a payment of attorney fees in the amount of $1,319.29 even though no litigation had been undertaken with respect to the Manos loan. Further, the inclusion of the $1,319.29 for attorney fees constitutes an "attempt to collect, directly or indirectly" a debt from Mr. Manos and a "representation and/or means in connection with the collection of any debt." On 27 July 2016 'Trustee Corps' sent a

second reinstatement quote to Jessi Manos in which Defendant requested the payment of $954.75 as 'trustee fees'.

190.    As part of the Fannie Mae attorney network Malcolm Cisneros agreed that

Nonjudicial Foreclosures: As with judicial foreclosures, the maximum allowable foreclosure fee for nonjudicial foreclosures is intended to cover all services that are typically required to be performed by foreclosure trustee or counsel in the completion of a nonjudicial foreclosure resulting in title transferring from the borrower to the highest bidder at the foreclosure sale, in accordance with local law. These steps include:
1. Ordering title
2. Reviewing title reports and exceptions
3. Preparing all necessary legal papers to initiate the nonjudicial foreclosure process, including Substitution of Trustee, Notice of Default, and Notice of Sale
4. Recording the necessary documents in the appropriate county recorder's office
5. Executing all steps necessary to obtain service of process on all persons entitled to notice, including review of process server affidavits and referral and tracking of published notices
6. Publishing and posting the requisite notices as required by local foreclosure law
7. Preparing all legal papers to conduct the foreclosure sale
8. Conducting, or arranging for sheriff or other third party to conduct, the foreclosure sale
9. Preparing and filing a report of sale with the local court or recorder's office, where required by local law
10. Preparing all legal papers necessary to convey title to Fannie Mae or a successful third-party bidder

191.    Further, Malcolm Cisneros further agreed that "the maximum allowable attorney or trustee fee for nonjudicial foreclosure proceedings does not include the *costs* involved in such a proceeding, such as title charges, filing fees, recordation fees, process server expenses, and publication costs, as applicable."

192.    At the time of the 8 June 2016 payoff statement no notice of sale had been mailed or recorded.

193.   At the time of the 8 June 2016 payoff statement the true principal balance of Mr. Manos loan was $268,423.24. This amount was noted in Ditch's loan servicing system and was readily available to Malcolm Cisneros.

194.   Pursuant to section 2924d of the California Civil Code the base amount for attorney fees could not exceed $1,046.06 to benefit from the presumption of reasonableness. Pursuant to the published table of permissible attorney fees allowed by Fannie Mae, Malcolm Cisneros could not receive more than $1000.00 for any foreclosure conducted in California in 2016.

195.   Mr. Manos hereby alleges that by the actions and omissions described above Malcolm Cisneros violated the Fair Debt Collection Practices Act as follows:

    A. The knowing and deliberate inclusion of an incorrect and inflated amount for the principal balance of the loan of $283,462.75 instead of $268,423.24, constitutes a false representation of the amount of the debt in violation of section 1692e(2)(A).

    B. The knowing and deliberate inclusion of $1319.29 in the 8 June 2016 payoff demand as attorney fees when no legal services had been performed by Malcolm Cisneros, constitutes a (1) false representation regarding services and compensation which may lawfully be received by any debt collector for the collection of a debt in violation of section 1692e(2)(B) and (2) an unfair practice in violation of section 1692f(1).

    C. Seeking to collect fees in excess of the base fee provided in California Civil Code section 2924(d) and in excess of the Fannie Mae published allowable

compensation --when no legal services had been preformed --constitutes (1) a false representation regarding services and compensation which may lawfully be received by any debt collector for the collection of a debt in violation of section 1692e(2)(B) and (2) an unfair practice in violation of section 1692f(1).

D. Concealing its role as a mandatory retained attorney from the Fannie Mae retained attorney list and its relationship with MTC Financial Inc. by using the d/b/a/ Trustee Corps constitutes an unfair and deceptive practice and means in connection with the collection of debts owed another in violation of section 1692e and 1692f.

E. Concealing the relationship between Malcom Cisneros and MTC Financial Inc. in order to collect both attorney fees and trustee fees for the same work constitutes an unfair and deceptive practice and means in connection with the collection of debts owed another in violation of section 1692e and 1692f.

196.   Malcolm Cisneros made the representations described above with knowledge of their falsity or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred.

197.   The acts described in paragraph 195 were done intentionally and maliciously to deceive Plaintiffs Jessie Manos and John Manos; to conceal Malcolm Cisneros status as a debt collector and its involvement with the collection process; to receive payment of money, and to limit the application of the FDCPA to the Defendant.

198.   Because of the acts described above Plaintiffs John and Jessie Manos suffered embarrassment, anguish, grief, annoyance, loss of reputation, delays, and/or economic losses.

199.   Plaintiffs believe and hereby allege that the acts described above comprise part of a pattern and practice of violations of the FDCPA committed by Defendant against similarly situated individuals.

### Count II: by Jessie Manos and Tara Borrelli against Malcolm Cisneros for violation of section 1692f(6)

200.   Plaintiffs incorporate by reference all foregoing paragraphs.

201.   The secured debt evidenced by Mr. Manos' promissory note and deed of trust was never owed to Ditech. The debt was owed to Fannie Mae or the MBS trust. The named Defendants, however, deliberately concealed from Plaintiffs and the public the legal status and ownership of the debt and the role of Fannie Mae and its servicers during the foreclosure process, initiated foreclosure without investigating the facts and without authority, and attempted to use self-help remedies against good faith purchasers for value in violation of settled California law.

### The Manos assignments

202.   As explained above on or about 10 September 2012 Citi prepared and recorded a bogus or fictitious intervening corporate assignment of deed of trust from MERS, as nominee for MetroCiti Mortgage LLC, purporting to assign the Manos deed of trust including "any rights due or to become due thereon" to itself. The assignment could assign solely the interest held by MERS Inc. Without the transfer of the note the assignment is a nullity. (Exhibits at p. 0064)

Law Offices of Larry R. Glazer
1875 Century Park East, Suite #700
Century City, California 90067

203.   On 15 January 2014, after Fannie Mae repurchased from CitiMortgage Inc. the servicing rights over the Manos loan, CitiMortgage had **no interest** in the Manos debt, note, and mortgage despite remaining as the beneficiary in the public record.

204.   On or about 17 December 2014 John Manos quitclaimed all his interests in the Foothill property to Jessie Manos. Ms. Manos took title to the property without knowledge of Fannie Mae's ownership of the note and corresponding mortgage. The only recorded security interest of record at the time was that of CitiMortgage who was neither the owner, holder, or servicer of the Manos note and deed of trust. On 17 December 2014 Jessie Manos, thus, acquired the status of a good faith purchaser for value. Since at the time Fannie Mae's held an unrecorded security interest vis-à-vis Jessie Manos, Fannie Mae cannot foreclose against Jessie Manos and her assignee, Plaintiff Tara Borrelli. Fannie Mae has a recourse in a lawsuit for money owed solely against John Manos.

205.   The Ditech 27 February 2015 corporate assignment of deed of trust purporting to "convey, grant, assign, transfer, and set over" the Manos deed of trust together "with all rights, title and interest secured thereby, all liens, and any rights due or to become due thereon" from CitiMortgage to Green Tree is also a nullity as Citi had no interest to convey (Exhibits at p:67) The assignment, which postdate the acquisition by Jessie Manos of the good faith purchaser status, cannot be used to foreclose Jessie Manos's interest and cannot launder a second chain of title to cure prior defects.

206.   Only Fannie Mae can enforce John Manos's debt but since Fannie Mae's interest is unrecorded Fannie Mae cannot use the non-judicial foreclosure against a good faith purchaser for value, like Jessie Manos.

207.   When, as here, the foreclosing entity had no legal authority to pursue a trustee's sale, "such an unauthorized sale constitutes a wrongful foreclosure." (*Yvanova, supra,* 62 Cal.4th at  935.)

208.   To the extent that Ditech received any "assignment" or "transfer" of the defaulted Manos note from Fannie Mae by virtue of the "holder-by-fiat" scheme described in paragraphs 86-9, it could not have occurred until 28 December 2015 when Ditech referred the Manos account for foreclosure. Such assignment, even lawful, does not cure the lapse in Fannie Mae's chain of title and cannot be used against a good faith purchaser for value like Jessie Manos and Tara Borrelli because it postdates the GFP status acquisition by Jessie Manos. Further, the holder by fiat scheme transfers only possession of the note but not the debt. As such, even if used against a borrower with title over the property, it will not vest the servicer with the right to enforce the debt. Under the holder by fiat Fannie Mae remains the only entity to whom the debt is owed and continue to have constructive possession of both the note and the deed of trust.

### Violation of section 1692f(6).

209.   None of the named Defendants is licensed or registered with the Department of Consumer Affairs, Bureau of Security and Investigative Services, and thus cannot lawfully engage in repossession activities under California law. *See* Bus. & Prof. Code §§ 7502, 7506.3.

210.   When Defendant Ditech directed Trustee Corps to commence foreclosure against the Foothill property -- even though Ditech neither owned nor held the note and deed of trust and had no right to collect and keep the Manos debt for itself -- Defendants violated the

California statutory foreclosure scheme.

211.   When Defendant Ditech and Trustee Corps commenced foreclosure against the Foothill property while a good faith purchaser for value held both title and possession to said property, defendants took non-judicial actions and self-help remedies designed to effect dispossession of Jessie Manos's and Tara Borrelli's property with full knowledge that under California law prohibit such actions and exempt the Foothill property for non-judicial dispossession through a private foreclosure sale. Defendants cannot use non-judicial foreclosure of the Foothill property to satisfy Fannie Mae's secured but unrecorded mortgage interest upon the default of John Manos.

212.   The self-remedies described in paragraphs 210 and 211 were taken against a property that is exempt by law from such dispossession and disablement and in violation of section 1692f(6).

213.   The self-remedies actions described in paragraph 210 and 211 were taken by Defendants when neither of them had a present right of possession over the Foothill property claimed as a collateral through an enforceable security instrument. Under California law neither a trustee under a deed of trust nor a beneficiary have a present right of possession of the property given as a collateral; they hold only a non-possessory lien against the debtor-mortgagor's property and can force a private sale only pursuant to the California non-judicial foreclosure scheme.

214.   The acts described in paragraphs 210 and 211 were done intentionally and maliciously to deceive Plaintiffs; to conceal Ditech's status as a debt collector rather than a beneficiary; and to limit the application of the FDCPA to Defendants.

215.   Plaintiffs believe and hereby allege that Defendants committed the actions referenced in paragraphs 210 to 211 with malice and with knowledge that no present right to possession had vested in Ditech and that Ditech had neither the right nor the authority to conduct a foreclosure in its own name.

216.   Because of the acts described above Plaintiff John Manos, Jessie Manos, and Tara Borrelli suffered embarrassment, grief, annoyance, loss of reputation, delays, and economic losses, out of pocket expenses, and incurred significant expenses to defend and remedy Defendants' unlawful actions. Further, Defendants have clouded the title to the Foothill property and have interfered with the property rights of Ms. Manos and Ms. Borrelli, both of whom took title to the property without knowledge of Fannie Mae's unrecorded interest.

217.   Plaintiffs believe and hereby allege that the acts described above comprise part of a pattern and practice of violations of the FDCPA committed by Defendants against similarly situated individuals.

### THIRD CAUSE OF ACTION
BREACH OF CONTRACT
**(by All Plaintiffs against Fannie Mae)**

218.   Plaintiffs incorporate by reference all foregoing paragraphs.

219.   Fannie Mae is the successor in interest to the originally named Lender in John Manos's promissory note and deed of trust and is bound by the terms of that mortgage contract.

220.   Ditech, as the Loan Servicer, is given specific limited functions in the mortgage contract as an agent for the Lender. The servicer is not a party to the contract.

221.   Fannie Mae and Ditech have no right to change unilaterally the terms of the mortgage contract, including who is considered a Lender under the note and deed of trust and who may obtain and keep payments under the note.

222.   Plaintiffs' mortgage contract requires insurance to protect the property "against loss by fire, hazards included within the term 'extended coverage' and any other hazards, including but not limited to, earthquakes and floods, for which Lender requires insurance." (Exhibits at p. 0010)

223.   This Court found that the LPI purchased by Ditech was due to the fact that "Plaintiffs' policy did not provide earthquake coverage as required by state law." ECF #88 page ID #2463.

224.   California law does not require a homeowner to carry earthquake insurance. http://www.insurance.ca.gov/01-consumers/105-type/95-guides/03-res/eq-ins.cfm

225.   Fannie Mae requires earthquake insurance only for Puerto Rico.

226.   Defendant Fannie Mae breached the mortgage contract and Ditech wrongfully interfered with the valid contract between the mortgagor and the mortgagee by (1) requiring Plaintiffs to obtain earthquake insurance in addition to the Farmers insurance policy already in place and (2) requiring Plaintiffs and members of the putative class to incur the inflated costs of force-placed insurance for the sole benefit of Ditech.

227.   This breach was willful and not the result of mistake or inadvertence. Defendants Fannie Mae and Ditech systematically require borrowers to pay for unnecessary insurance beyond the amounts required and for perils for which no insurance is required under law or

under their mortgage agreements solely for the financial benefit of Ditech, a non-party to the mortgage contract.

228.   As a direct result of this breach of contract Plaintiffs have suffered damages in the form of inflated insurance premiums, escrow charges, interest payments, other unspecified charges, and unnecessary burdens on their property rights.

229.   Plaintiffs and the putative class are entitled to recover their consequential damages and other appropriate relief for the Defendants' contractual breaches.

## THIRD CAUSE OF ACTION
### UNFAIR COMPETITION UNDER SECTION 17200 ET SEQ.
### (by all Plaintiffs against Defendants Ditech, Citi, and Fannie Mae)

230.   Plaintiffs incorporate by reference all foregoing paragraphs.

231.   Plaintiffs bring this action pursuant to Business and Professions Code Sections 17200, *et seq*.,

232.   California Unfair Competition Law prohibits all unfair competition, which is defined as "any unlawful, unfair or fraudulent business act or practice." Plaintiffs have standing to bring this claim because each of them is a direct victim of the illegal, unfair, and fraudulent business practices described under the RICO count in which Defendants engaged in solely for their financial benefit.

233.   Each Defendant is a "person" as defined under Business and Professions Code §17201. Each of the directors, officers, and/or agents of the named Defendants are equally responsible for the acts of the other directors, officers, employees and/or agents as set forth in the Business and Professions Code §17095.

234.   Pursuant to §17203, Plaintiffs bring this action in their own interests, in the interests of other borrowers injured by Defendants' prohibited acts and practices, and in the interest of the general public.

235.   Each member of the putative class has suffered an injury in fact and pecuniary losses in the form of depleted escrow accounts and additional debts paid for inflated, unreasonable, and/or unconscionable fees and charges. Further, Defendants deprived borrowers of statutory rights and rendered title to property unmarketable.

236.   As it relates to Plaintiffs Tara Borrelli and Jessie Manos, good faith purchasers for value who took title without knowledge of Fannie Mae's unrecorded and thus unsecured interest, Defendants' acts and practices were performed to foreclosing on the Foothill property and have diminished Plaintiffs' property rights.

237.   Plaintiffs and other borrowers reasonably expected that lenders, and their successors in interest, would not seek to change unilaterally the terms of mortgages or engage in the collection of debts though the use of the following devices: (1) false and/or misleading representations; (2) unfair and abusive practices; and (3) deceitful, deceptive, and otherwise misleading means to collect debts not owed as described in paragraphs 75 to 141. Plaintiffs and other borrowers reasonably expected that lenders, servicers, trustees, and other vendors would not engage in the following unfair practices: (1) deliberately misrepresenting the character, amount, and legal status of debts; (2) threatening to take unlawful actions; and (3) collecting amounts, including interest, fees, charges, insurance premiums, and expenses incidental to the primary loan obligation, that were not required and/or not authorized by the mortgage contracts or applicable law. The practices are

described in paragraphs 75 to 150 above. Plaintiffs submit that they hold reasonable and objective consumer expectations associated with residential mortgage debts.

238.   Defendants knew that monthly mortgage statements, reinstatement quotes, and payoff demands contained inflated, impermissible, and/or unearned fees and expenses. Defendants knew that statements made in recorded assignments of deed of trust were false and/or misleading as stated in paragraphs 75 to 119 above.

239.   Plaintiffs believe and hereby allege that Defendants' actions, practices, and omissions are unlawful, deceptive, and unfair business practices under California Business and Profession Code Section 17200 et seq.

240.   Defendants devised the five schemes described in the RICO count to avoid the application of consumer protection laws and repeatedly violated 15 U.S.C. 1692e(2), (4), (8), (10), and (12), 1692f, and 1692g, 18 U.S.C. 1341, 1343 and California Civil Code sections 2932.5 and 2936.

241.   Moreover, § 2923.55(b)(1)(B)(iii) of California Civil Code require the loan servicer to inform the borrower, before a notice of default is filed, of the borrower's right to request copies of any assignments of the deed of trust —required to demonstrate the right of the mortgage servicer to foreclose. Mr. Manos requested the information but Ditech deliberately failed to provide the unrecorded assignment to Fannie Mae Citi and Ditech had executed. Further, §2924.17 (b) require the servicer to ensure the documentation substantiates the right to foreclose. Defendants not only failed to do so but deliberately manipulated the rules and structured their practices to foreclose in the name of entity without authority to foreclose.

242.   The legislative history shows that the provisions cited in paragraphs 241 above were added to the statute due to reports that nonjudicial foreclosure proceedings were being initiated on behalf of companies with no authority to foreclose. (See Sen. Rules Com., Conference Rep. on Sen. Bill No. 900 (2011–2012 Reg. Sess.) as amended June 27, 2012, p. 26.)

243.   Plaintiffs believe and hereby allege that Defendants hid Fannie Mae's interest in the notes, loans, and mortgages and named other entities as beneficiaries of the deeds of trust in public records to minimize recordation costs, increase default related revenues, and maintain their competitive market advantage.

244.   Plaintiffs believe and hereby allege that Defendants' conduct and business practices are unfair: (1) they are deceptive; (2) they expose borrowers in default to substantial additional financial burdens through means that are unethical, oppressive, unscrupulous, and/or substantially injurious to consumers; and (3) they interfere with the recordation statutes and create uncertainty regarding the validity of property titles. The harm caused to the victims outweighs any benefits that the conduct may have to Defendants.

245.   Plaintiffs believe and hereby allege that Defendants' conduct and business practices are also fraudulent because members of the public are likely to be deceived by the conduct as described in paragraphs in the RICO count above.

246.   Defendants' unlawful, unfair, and deceptive acts and practices occurred repeatedly and were capable of deceiving a substantial segment of the public.

247.   As a direct and proximate result of Defendants' unfair, unlawful, and deceptive practices Plaintiffs and members of the putative class have suffered and will continue to

suffer actual damages and financial losses.

248.   Defendants have been unjustly enriched and must make restitution pursuant to sections 17203 and 17204 of the Act.

## CLASS ALLEGATIONS

249.   Plaintiffs incorporate by reference all foregoing paragraphs.

250.   Plaintiffs bring this claim on behalf of four separate classes pursuant to Fed. R. Civ. P 23(a) and (23)(b)(1), (2) & (3).

251.   Plaintiffs are members of all three proposed classes and, as members of those classes, each Plaintiff is a 'representative party' as the term is defined in Rule 23(a) and has the right to sue on behalf of the absent class members.

252.   Violations complained of:

A.   Defendants violated the RICO by falsifying, concealing, and/or covering up by various tricks, schemes, and/or devices the name and identity of the true creditor and owner/holder of the note secured by a recorded deed of trust, a material fact, in an effort to deceive the consumer and to obtain benefits to which they were not entitled under law or contract.

B.   Defendants violated the FDCPA by demanding and/or collecting excessive, unspecified, and/or unearned legal fees neither authorized by law nor expressly agreed to by the class members in the agreements creating the debt.

C.   Defendants violated the civil RICO statute by devising a scheme to swindle borrowers in default as described in sub-part (A); by recording bogus assignments of deeds of trust; by mailing monthly statements, payoff demands, and reinstatement quotes

that contained false statements; and by seeking to collect excessive, unspecified, and/or unearned fees and charges generated through sham entities, thereby increasing the debt of borrowers beyond what they were contractually obligated to pay.

The classes are defined as follows:

**A.   FDCPA Corporate Advances Class:**

(1) All individuals who held title to real property in the State of California secured by a deed of trust or who signed the promissory note underlying the security instrument (2) against whom Malcolm Cisneros, or their agents, collected or attempted to collect, directly or indirectly legal fees; (3) where the loan was owned by Fannie Mae; and (4) the debt was incurred primarily for personal, family, or household purposes. The period covered is from 18 June 2015 to the time of the class certification determination.

**B.   RICO/Cal. Bus. & Prof Code 12700 Delinquency Class**

(1) All individuals who held title to real property in the State of California secured by a deed of trust or who signed the promissory note underlying the security instrument; (2) where the loan was owned by Fannie Mae; (3) the servicer was either Ditech or CitiMortgage; and (4) where the servicer had reported the loan to Fannie Mae as code 80 (signifying Breach Letter Sent) or its equivalent. The period covered is from 18 June 2012 to the time of the class certification determination.

**C.   RICO/Cal. Bus. & Prof Code 12700 Insurance Class**

(1) All individuals who held title to real property in the State of California secured by a deed of trust or who signed the promissory note underlying the security instrument; (2) where the loan was owned by Fannie Mae; (3) the servicer was either Ditech or CitiMortgage; and (4) where Defendants mailed to the borrower a notice of the placement of force-placed insurance. The period covered is from 18 June 2012 to the time of the class certification determination.

253.   Plaintiffs reserve the right to amend the class definitions and/or add subclasses in their Motion for Class Certification as necessary.

254.   Each class is so numerous that joinder of all members is not practicable. Plaintiffs are unable to state the precise number of potential class members in each class because the information is exclusively in the possession of Defendants. On information and belief, and based on the factual investigation conducted to date, Plaintiffs allege that there are at least 1000 members in each class.

255.   There are questions of law and fact common to each class that predominate over questions relating to the claims of any individual class member, including Plaintiffs. The predominant questions for each class to which common answers will drive resolution of the litigation are as follows:

(A) whether the uniform practice by servicers to withhold Fannie Mae's name and interest in the debts, notes, and mortgages amounts to an actionable misrepresentation;

(B) whether a statement in an assignment of mortgage that the assignor 'assigns', 'conveys', 'transfers', or 'sells' the deed of trust together with "all rights due or to become due", where Fannie Mae was the actual owner and holder of the note, amounts to an actionable misrepresentation;

(C) whether the practice of memorializing the transfer of servicing rights by using intervening assignments of deeds of trust amounts to fraudulent, deceptive, and/or unfair collection practices under the FDCPA or unfair competition under section 17200 et seq.;

(D) whether collecting, or attempting to collect, unearned amounts for services not performed violates the FDCPA or section 17200 et seq;

(E) whether the uniform practice of the Enterprises to collect or attempt to collect unearned amounts for services not performed, such as fees for anticipated future property inspections, late charges, title work, legal work, and other miscellaneous fees prior to the actual accrual of such fees without disclosing that the specific amount is an estimate for future services, violates RICO or section 17200 et seq;

(F) whether the uniform practice by servicers to force place insurance in their own name and receive commissions from the premiums added to the borrower's debts violates section 17200 et seq.;

(G) whether the acts alleged amount to mail and/or wire fraud;

(H) whether the acts described in this complaint amount to a pattern of racketeering activity under RICO.

256.   Plaintiffs' claims are typical of the claims of the putative class members. Because the class representatives' claims arise from the exact same practices and procedures that form the basis of the class claims, and because the claims are predicated on the same legal theories, any factual differences that may exist are insufficient to defeat typicality.

257.   Plaintiffs' claims arise from the same pattern and practice of illegal acts -- misrepresenting the ownership of notes and mortgages; demanding excessive, unreasonable, unauthorized, and unearned fees and premiums; and asserting wrongful possession over property claimed as collateral through a security interest without a present right of possession -- that give rise to the claims of the class members. Plaintiffs' claims are also based on the same legal theories — that each such practice violates the RICO statutes.

258.   By pursuing their claims Plaintiffs further the interests of each class.

259.   Plaintiffs will fairly and adequately represent the class members as class representatives under Rule 23(a).

260.   Plaintiffs will pursue the claims vigorously. Plaintiffs have retained competent, experienced litigation counsel to pursue this action. Plaintiffs have no interest antagonistic to the absent class members.

261.   A class action is superior for the fair and efficient adjudication of this matter:

(A) individual actions are not economically feasible;

(B) members of each class are likely to be unaware of their rights;

(C) Congress intended class actions to be the principal enforcement mechanism under the FDCPA and RICO. Further, by enacting section 17200 et seq. the California legislature delegated the policing of unfair competition to injured consumers on behalf of other aggrieved persons.

262.   Class adjudication of the claims of the absent class members is appropriate for the following reasons:

(A) injunctive relief or declaratory relief would be appropriate for the class as a whole;

(B) the questions of law and fact identified above are common to all class members and predominate over any questions affecting individual members;

(C) a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy at bar.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1) Declaring this to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Classes;

(2) Enjoining Defendants from continuing the acts and practices described above;

(3) Awarding damages sustained by Plaintiffs and the classes as a result of Defendants' breaches of the mortgage contracts, together with pre-judgment interest;

(4) Awarding actual and statutory damages sustained by Plaintiffs and the classes as a result of Malcolm Cisneros violations of the FDCPA;

(5) Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the classes, together with pre-judgment interest;

(6) Awarding Plaintiffs and the classes costs and attorney fees for violating the FDCPA;

(7) Awarding Plaintiffs and the classes restitution, injunctive relief, declaratory relief, attorney fees, and costs under section 17200 et seq.;

(8) Awarding a penalty of $500,000.00 or 1% of each Defendant's net worth for violating the FDCPA;

(9)  Awarding compensatory and treble damages and attorney fees and costs under the federal RICO statute; and

(10)  Awarding such other and further relief as justice requires.

Respectfully Submitted by

_____*s/ Nicolette Glazer Esq.*_____
Nicolette Glazer Esq.
LAW OFFICES OF LARRY R GLAZER
1875 Century Park East #700
Century City,  CA 90067
T: 310-407-5353
F: 310-407-5354
nicolette@glazerandglazer.com
ATTORNEY FOR PLAINIFFS AND THE
PUTATIVE CLASSES

## JURY DEMAND

Plaintiffs hereby exercise and invoke their right to a jury trial.

Respectfully Submitted by

_____*s/ Nicolette Glazer Esq.*_____
Nicolette Glazer Esq.
LAW OFFICES OF LARRY R GLAZER
1875 Century Park East #700
Century City,  CA 90067
T: 310-407-5353
F: 310-407-5354
nicolette@glazerandglazer.com
ATTORNEY FOR PLAINIFFS AND THE
PUTATIVE CLASSES

## CERTIFICATE OF SERVICE

I hereby certify that on 3 March 2018 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the appropriate CM/ECF registrant.

DATED:  16 January 2018

Respectfully Submitted by

_____s/ Nicolette Glazer Esq._____
Nicolette Glazer Esq.
LAW OFFICES OF LARRY R GLAZER
1875 Century Park East #700
Century City,  CA 90067
T: 310-407-5353
F: 310-407-5354
nicolette@glazerandglazer.com